Good morning and may it please the Court. My name is Jim Van Ness and I am the Appellant's Counsel. This case is intensively fact-laden and if I can beg the Court's indulgence, I would like to give a brief recitation of the pertinent facts before going into the substance of our argument. This started out as a three-party lawsuit in state court in Idaho before it was removed to federal court. The Doughtons, the appellants, had entered into a long-term lease with When it was removed because of The joinder of the federal defendant. All right. The Doughtons in this case had entered into a long-term lease with option to purchase from the original plaintiffs, which was Six Flags Corporation, unrelated to the theme park Six Flags. When the lease was initially negotiated, Merle Hone, which was the matriarch of the Hone family, made a number of material misrepresentations about the productivity and the condition of the equipment, the irrigation equipment on the property. As a result of that, the Doughtons incurred several hundred thousand dollars worth of expenses in the first year that they hadn't anticipated. When they brought this up with Hone's, Merle Hone negotiated a waiver of lease payments to set off this investment. Unfortunately, before the waiver was executed, Merle Hone passed away. Immediately after that, two of the Hone principals, Terry Hone and Bart Hone, did execute the waiver. But prior to the final individual, Geraldine Hone, executing it, the viewing was held for Merle Hone. Now, this is where the FSA enters the picture. Brad McMurkry was an officer of the FSA, but he was also a longtime friend of the Hone's. He had grown up in the same town. He had had a romantic relationship earlier in his life with Geraldine Hone. He attended this viewing, and in the midst of the viewing, Geraldine Hone made the statement to him that it was going to be a difficult day the next day, because under the terms of the lease, they were supposed to surrender Merle Hone's house to the Doughtons. She hadn't lived in it for some time. It was serendipity how this was working out. She just didn't want to deal with it the next day. Brad McMurkry made the comment, or relative to this comment, that she didn't bother. Don't get excited about doing that. That he had the knowledge, being the loan officer at FSA, that the Doughtons financing looked shaky, and the loan was probably not going to be approved. Immediately after that, Geraldine Hone refused to execute the waiver. Instead, noticed a default based on the payments which the Doughtons had not made, because they had relied on this waiver, and then the State court action was brought. Immediately upon removal to State court, the ---- Were the Doughtons in default at that time, or in arrear? Not when the waiver was negotiated. It was prospective to waive lease payments. But they had been, at the time of the waiver, waived the previous ---- At the time it was negotiated, they were current. This was a remedial action to take into effect the fact that they had invested so much that previous year, and so it was the future payments that were waived. One of those happened to come up during this period of negotiation through execution. Again, it's serendipity that it happened that way. But the end result was the action was brought to terminate the lease. The Doughtons brought a third party complaint against the FSA for McMurphy's actions. Excuse me, is the microphone working? It just kind of cuts right there for a second. I'm going to do it again. I'll follow up. Keep an eye on it. And when they were served, the federal government renewed this action. Immediately upon removal, the Doughtons then served a discovery request on leaving the federal government. Also, in conjunction with this, the Assistant U.S. Attorney, Robert Grisham, filed a typical certification scope of employment. That invited two responses, one from the Doughtons in opposition and one from the Holmes, which was labeled in support, but actually the facts in the brief were in opposition. Could you help me? What exactly is it that McMurphy did? What exactly was the damage? You mean the legal damage? Yeah. The legal damage? What was the conduct that harmed the client and how were they harmed? It falls under two groups. One of them was breach of privacy act, which I'll discuss. Tell me what was the fact. The fact was making, divulging the statements to taint the process of the execution of the waiver. We had two parties that had executed it. The Holmes, excuse me, the Doughtons had relied upon the negotiation of the waiver, had sought financing for the next year for their operation. But for McMurphy's statements, Ryan Fletcher had indicated she was going to execute the waiver. But for his statements that they were not creditworthy, in essence, and don't be in a rush to do this because their loan is going to be denied. Their loan was subsequently denied. Well, here's my problem with the theory, and I don't know what pigeon hole to put this in, but if the loan was going to be denied during the acknowledged course of business, that is, the approval or denial of the loan is within the scope of employment, and if the loan, in fact, was going to be denied, what difference did this ultimately make if they could not obtain financing anyway? They did obtain the financing. They went through the Agricultural State Mediation Program, which brought in a third-party mediator with their lender, which was Science Bank. FSA was a guarantee fund. There wasn't a direct lender. And through the mediation, FSA was forced to make the loan eventually. Okay. So the harm is where? If when it was denied, it would have been denied anyway, and if after mediation it was forced to be granted, then I guess I don't see the additional financial harm to your clients from this comment. It's twofold. First is that in the mediation, the Science Bank asked for McMurtry's supervisor, if not McMurtry, to participate in these proceedings. The doubters had demonstrated that McMurtry had demonstrated animus against them. This is brought out by the affidavit of Alan A. Vanderbilt. But bad feelings are not legally cognizable. I mean, the fact that he didn't like them, you know, I guess I don't see where that goes. Under the Court of Appeals case, the Padola case on scope of employment, acting out of a personal motive removes it from scope of employment. Okay. I'm still asking, though, where is the harm to your clients other than frustration? The harm was that the lawsuit was drawn, which they never honored the waiver. And so the district court basically accepted the Holmes argument that the waiver was not binding, and the doubters lost the ranch, which they had made these hundreds of thousands of dollars worth of improvements, of which they had option to purchase. And if he had said nothing at the wake other than, Nice to see you. Sorry things are going badly in your personal life. What would have been different? The doubters would have continued with that lease. It was a five-year lease, a build-out lease to which they were making capital improvements. They had a buyer in the wings. That was the reason for the option to purchase, so that they could take this ranch, bring it up to a certain standard, where they could then sell the property for profit to them. Unrelated to this appeal, the original party's interest was six blacks. That party settled by allowing the doubters admitted early to in fact sell the property to this third party at a greatly reduced price. It is the appellant's theory that had McMurphy not interfered, and the waiver had gone on as it was to be, and doubters had remained in possession of that property for the term of their lease, they would receive the maximum which the buyer had already promised to give them. Instead, this was just maybe two years ago, right when this appeal was originally filed, that's why we've got those two cases in front of us today, is because it had been settled, received and promised a year, and that part of the case was settled out. Somebody recognized the damage, otherwise... Well, let me ask you a question, because I think it sounds so misogynistic. The statement was made at the waiver. What did the person who the statement was made to do as a direct result of that statement? As a result of the statement, don't allow the doubters to take possession of the house. Don't continue with this lease. You're financing the issue. Right. The home then, notice the default, as I said, in this period between when the waiver was negotiated, and doubters relied on that waiver so they didn't make the lease payment, to the point where Earl Hunt died, the lease payment was due. So then Holmes' legal theory was, ah-ha, if the waiver is not effective, then you're at fault. So let me see if I understand this. Your theory is that but for the statement, the remaining family member would have signed off, and the waiver would have gone, would have continued, rather than having a notice of default. That's correct. And, okay, even though in fact the waiver was informal in the sense that it had not been signed, your clients relied on something that was hoped for but not completed. Two of the three signatures were on the document, and it had been delivered. But they knew that they needed all three. Geraldine Holmes later represented in the notice of default that by their articles of incorporation, her signature was required on the waiver. The original waiver did not contain a space for her signature. Well, that's a completely different theory. That's a theory that if you were right about that, then there would be no harm, because if her signature were unnecessary, his statement to her wouldn't have had any effect. I understood that doubts didn't, doubts relied on the fact that Terry Holmes and Bart Holmes' signatures were operative. Terry Holmes took that into the Bank of Science National Bank as part of the, if we waive these payments, please continue with the financing. And it's only after these statements that Geraldine Holmes made the assertion, the waiver is inoperative because of my signature. The President said it was. So your current theory is that her signature was required, and was prevented by this gentleman's statement. Yes. And that is why her articles later did show that her signature was required. And that was for the possession of that information at the time. They had relied on Marltone's representations. In fact, when the lease was negotiated, Marltone had represented, and continued to represent, that she had all authority to negotiate the lease and anything resulting from the lease. The lease was originally signed by Marltone, and then later the rest of the Holmes and his six wives and their other enemies signed on to his will. But it was a continuing representation from Marltone that she had that authority, not just within her. Well, suppose this bureaucrat hadn't gone to the wake and stayed home, and there hadn't been any busybody conversation about disparaging credit. What evidence is there that this lease would have been renewed because the negotiation for the waiver hadn't been completed yet? The lease was not issued. Well, or the lease wasn't going to, or the default was not going to be, the rent hadn't been paid. Correct. And so how long had it been in arrears? It had been in arrears approximately three months, if I recall. So what's the causal connection between this alleged disparagement of credit and the decision by the lease lessor to go ahead and declare the default and demand the money, demand the money or the termination? Well, first, if the waiver had not been negotiated, the doubts would have made those things. From what source? From farm products. This is a very large farm enterprise. Well, did they have the money in hand to pay the back rent? Certainly. It wasn't back rent. It was a lease payment. They were three months behind on making the lease payment. Were they depending on this federal, what was it, the crop subsidy loan or something? No, it was the Farm Service Agency that said, it's not part of the subsidy program. But in this case, it was a loan. Well, is that the money they were expecting to use to catch up on the lease, or were they going to put it into other activities on the rent? It was from the Zions Bank when it was going to next year's operating. They were sitting on reserve at that point. And when they negotiated the waiver, they were firm at that point. The waiver was up to January 1st payment, is my understanding. And they were starting to negotiate it at what time? That was in the fall. Before the January payment was due, they started to negotiate about a waiver. That's correct. But they never concluded the negotiation or executed a written memo of it. Well, the waiver negotiations were concluded, and a written memo was written and signed by two of the departments. It was just required on the OMS later commission required a third signature. And that one was withheld? Withheld or failed to appear in a way. That's correct. You have 12 minutes left. I will reserve that for another time. Thank you. Good morning, ma'am. Please report. Good morning. So in this case, it involves a very simple and essentially undisputed set of facts to which the court, the district court, correctly defied applied legal principles to which the doubts are inherent. And today, for the first time, we've heard yet another purity upon which the doubts would like to premise. Liability would require to me to walk back to the facts of the liability issue a little bit more and hopefully shed some light on what is actually substantiated in this record. Certainly, we agree that in April of 1999, the appellants to Anthony Dowling entered into a lease. We're not going to forget that issue. The problem that we have is that some of the representations made by the attorneys that simply are not supported in the record are likely to point towards attention to the actual lease waiver agreement upon which the doubt was relied. So specifically, which is set forth in the excerpt of the record at page 48, and is very apparent in the case of that document, that while there is no actual date after the signature, the document itself states April 22nd of 2000. And of course, that is nearly a month or so after this purported statement by Mr. McCarthy to Gerald Reinflash at her mother's wedding. So it's very meaningful. I don't see what that has to do with it, because if the statement influenced the refusal of someone who had to sign, it doesn't matter that it didn't influence the other two. I mean, it never alleged that it influenced everybody, but only the last holdout signatory. I understand, Your Honor. However, there's simply no indication that anyone had signed the lease waiver agreement prior to this statement being made. And there's really no record that it influenced Gerald Reinflash's decision to sign or not to sign this document. In fact, there are, from Gerald Reinflash's signed affidavit, there's every indication that she had concerns about the lease. Isn't that an issue of fact, though? I mean, if there's a – assuming that the statement is otherwise actionable, whether it affected or didn't affect the outcome, the causation question would be presumably a question of fact, because there's – at least isn't there a permissible inference that it has some effect? Well, that would in fact be a factual question of the system developed in this record. However, it's irrelevant precisely because the Farm Service Agency had a mediation held in late April of 2000, in fact approved the operating loan. But I think, Your Honor, we're focusing on exactly what the district court focused on, and that is where is the harm in this system? Well, opposing counsel says they would have gotten a better price for the farm. Well, again, there's absolutely no record of that. In fact, the district court granted summary judgment on it. It's now not before the Court because the original plaintiffs in the thousands have since settled. The district court granted summary judgment in favor of Six Flags as the original plaintiffs, holding that the lease amendment agreement did not cover certain lease payments and that there were other grounds upon which to find the Dowtons in the fault, and that therefore summary judgment on the breach of contract claim between the Six Flags plaintiffs and the Dowtons should be granted in favor of Six Flags. And, of course, now that that claim has been settled, so there's no indication in the record, at least, about what, you know, the terms would have been of a potential sale of the property as opposed to what actually happened. Okay. So let me see if I understand your argument correctly. The claim that the Dowtons have against your client is you interfered with what otherwise would have been a favorable contractual relationship with these other folks, and you're saying, well, there was no breach of contract between them and the other folks at all, so therefore there's no harm. Is that kind of your theory? Well, that goes to the merits of the State tort law claim that is asserted against Mr. McMurtry and the Farm Service Agency of the United States. However, there's a separate and independent basis that makes that whole analysis irrelevant, and that is that the district court concluded, of course, that the Dowtons had failed to exhaust their administrative remedies under 28 U.S.C. section 2675 against the United States and that, therefore, there was no jurisdiction over those State tort law claims. So we need not even consider, you know, whether there's merit to the State tort law. Let me understand. This is a suit against who? Originally McMurtry? No. Mr. McMurtry and the United States, in addition to the Farm Service Agency, were all to the breach of contract claim in State court. And, of course But their claim is, that's here before us, is against? Is against the United States. The United States came in through the U.S. Attorney's Office in the Eastern District of Washington, certified that McMurtry was acting within the scope of his employment, was substituted as the party defendant, and then argued in a motion to dismiss that because the Dowtons had failed to exhaust their administrative remedies with respect to the State tort law claims, they should be dismissed for lack of subject matter jurisdiction. What possible business reason, assuming the facts in favor of the Dowtons, as we must for this purpose, at least, what possible business reason would McMurtry have had to tell an old friend, those people aren't going to get their loan, they have some credit problems? Well, these His job is directly to decide if they have the credit problems, but not to go talking to other people about it, presumably. It certainly is an unusual set of circumstances, Your Honor, and I must be candid on that. However, he, at the time, he made the statements to Ms. Reinflash, it's undisputed based upon Mr. McMurtry's affidavit, that he also knew, in addition to having this personal relationship with Ms. Reinflash, that she was, in fact, a private credit source to the Dowtons. She did have this business relationship with the Dowtons, and that he believed he was making a disclosure that had been authorized in writing before that. But the question, of course, is not whether I'm trying to understand. It's not whether it was a tortious statement, it may have been, but it's whether or not he was acting in the scope of his employment in saying it so that the claim is properly brought against the United States, and if the United States is properly substituted in, therefore, if the United States is the party, then they should have exhausted administrative remedies against the United States. That's exactly correct, Your Honor. And, in fact, the, you know, the Dowtons don't take issue with the rule that was applied by the district court that the Idaho State Respondeat Superior Principles flowing from the Pollen v. Idaho Legal Aid Services case reported at 854 Pacific 2nd, 280, and also from the Richard J. and Esther E. Woolley Trust v. the Best Plumbing Case reported at 983 Pacific 2nd, 834, in which the Idaho State court has set forth a pretty liberal standard with regard to what actions are within an employee's scope of employment. Here's my greatest difficulty with your argument. Let's, I mean, part of my job is going to be to decide this case, and that's within the scope of my employment. If I decide to gossip over dinner with a friend and tell them, you know, how the argument went, is that within the scope of my employment just because the subject matter is my employment? Well, applying the standards set forth by the Idaho courts, it may very well be, Your Honor. It may very well be. That's sort of analogous to what happened here. He wasn't actually doing anything related to the loan, other than. Well, the district court did find that, you know, as part of his job duties and relying on the affidavits that were available, that he was frequently called upon to answer questions, whether it be, you know, within ordinary business hours in his office or outside of that context. It's not the turning that bothers me. It's not even the place that bothers me. It's sort of the nature of the interaction that seems far flung from what his possible business purpose could have been. And it certainly was less formal than we would expect most of these disclosures, you know, a less formal context than what we would expect most of these disclosures to be made in. However, it would certainly be expected that in assessing whether or not to give one of these loans, Mr. McMurtry would anticipate speaking to creditors of the prospective borrowers, particularly in light of the substantial default, which is uncontested in the record. Today is the first time I have heard the Dowdens assert that somehow or another in March of 2000, they were not in substantial default in their payments under the lease. Well, is it within the – I don't quite understand what these loan officers do. So would it be – if they're guaranteeing a loan, would it be within their legitimate scope of concern to make sure that – or to be concerned about third parties relying, extending credit on the basis of a loan that might not go through? Is that a legitimate concern? Yes, Your Honor, in part because one of the things that gave Mr. McMurtry pause, and this is set forth in his affidavit in the supplemental excerpts of record, the substantial default on the lease, which, of course, Gerilyn Reinfleisch, through her capacity as an officer of the Six Flags Corporation, would expect to be a beneficiary of the payments on this lease, there was some concern about whether there would be enough cash flow to actually pay back the loan if, in fact, loan proceeds, rather than, you know, being used to make the farm a profitable enterprise, were, in fact, used to pay these past-due lease payments. So there was certainly some concern that the relationship between the landlord and the tenant, in this case, would affect the applicant's ability, in this case the Dowton's, to repay the loan. There was some waffling here by the United States, I guess, as to whether or not this was – he was acting in the scope or not. But was there – we have a certification now before us that he was? Yes. In fact, the Eastern District of Washington, the U.S. Attorney's Office for the Eastern District of Washington, when they entered their appearance for the case, took a second look at the file and issued a certification pursuant to 28 U.S.C. section 2679. So is the law that the plaintiffs have to disprove that? By a preponderance of the evidence. By a preponderance of the evidence that he wasn't acting in the scope? That's correct, Your Honor. And the district court went through that analysis. The evidence that was before the district court on that point was what? The evidence that was before the district court on that point were a number of submissions by all of the parties, including no less than four memoranda, which are set forth in our papers. But docket number 92, docket number 102, docket number 103, in particular in the district court proceedings, were memoranda the Dowton's filed on that subject. They also filed a statement of facts, which is docket number 104, an affidavit by Denise Dowton, which is docket number 105, a separate affidavit by Denise Dowton, which is docket number 107, and a reply by the third-party plaintiffs, Jimmy and Denise Dowton, which is docket number 111. In addition, McMurtry, who was being represented privately at that point, submitted his own brief in support of the certification issue. And in support of that brief, he filed an affidavit by a gentleman named Frent Mendenhall, who was a district director for the FSA, and also an affidavit that he himself prepared. And, of course, the U.S. Attorney's Office for the Eastern District of Washington not only adopted those affidavits but made its own legal arguments. Well, what evidence is there of what this – that making state – that preventing other people from relying on credit might be within the scope – is within the scope of the duties? The district court primarily relied upon the affidavits of Frent Mendenhall and Mr. McMurtry himself, yes. And those are set forth in the excerpts of record at pages 346 through 354. Oh, I apologize. We submitted those as part of our supplemental excerpts of record. And they're pages 1 through 7 and pages 8 through 14, I believe, respectively. In addition, the district court did consider one of the arguments that the doubtants have raised here again today, and that is this negative inference, if any, to be drawn from the affidavit of Alan H. Banta, in which he recounts this instance of Mr. McMurtry purportedly having said something derogatory about the doubtants on yet another occasion at a mediation involving some other FSA loan applicants. And the district court said, well, that as a matter of fact does not establish by a preponderance of the evidence that Mr. McMurtry – exclusively out of a personal motivation more than two weeks before when he had made the statement at the weight. Well, it's a permissible inference. It may not be the only inference, but Banta does say that McMurtry demonstrated personal animosity. And that's usually not a transitory state. Or, I mean, at least one could draw the inference that two weeks earlier, if he hated them on day 14, he might have hated them on day one. Well, that's correct, Your Honor. I think the district court considered that possibility and said, even so, it does not establish by a preponderance of the evidence that Mr. McMurtry was exclusively motivated by animosity when he made the statement. The previous. Right. And that's pretty clearly the standard that is to be applied under the Idaho respondeat superior cases. I'd briefly like to address just a couple of other issues. Well, actually, I'd be happy to answer any further questions that you have. There is one additional issue. I don't think you need it. What is the additional issue? Well, actually, if that's all the questions you have, I'd be happy to rest at this time. Thank you. Thank you. Your Honors, I would like to correct one statement made by the appellee. He said there was no evidence in the record about this value to the end buyer of the Douthis Ranch, and this actually is in Denise Douthis's deposition, which was attached to the Six Flags summary judgment motion. So the evidence is in the record. It's not part of the appeal here today. It's not relevant to that inquiry. I would also like to point out that the government has made the argument that the Hones were a credit source, and this is in distinction to the United States v. Anderson. It's 542 F. 2nd, 516, a Ninth Circuit case, which actually is an FSA case, which defines the term credit source as used in the waiver, the Privacy Act waiver, as one who extends loans. As appellee's counsel clearly recognized, this was a landlord-tenant relationship. It was not a creditor-lender relationship. Idaho law recognizes that difference. Second, these affidavits that were put forth by Mendenhall et al. are sham affidavits. There was a clear written job description that was introduced into the record of McMurtry's to distinguish those job duties and to invent some where none had existed before. Clearly, the written job description controlled, I don't care what the affidavits, would have invented to allow this to be some permissible act. Again, the landlord-tenant relationship was a sham affidavit. Isn't it pretty common for jobs to have more to them than is in a written job description? I mean, isn't that almost always the case? I would refer the Court to, I put an Internet link in our memo, and it's an extensive job description. I agree. Well, that begs the question. I mean, my question, isn't it perfectly reasonable to say that no matter how extensive the job description, there may be something more to it? It may not list, you know, restock the toner, but maybe you end up doing that because it needs to be done. I guess. Certainly. But these affidavits go way beyond that. They try to make this personal visit to a family friend, with his family in tow, after business hours, on a weekend, to console a personal friend somehow within the scope of his duties, and they try to do this by saying that the Hones were a credit source. And as I said, they clearly weren't. This was a landlord-tenant relationship. Hones had no relationship whatsoever with Zions Bank or FSA. There was absolutely no reason for McMurtry to make that type of statement. And one final point I'd like to make on the exhaustion issue. Yes, the district court ruled that they had not exhausted. Under the exhaustion statute under the Federal Torts Claims Act, that if it's asserted as a third-party claim, then exhaustion is implicable. Then the issue becomes, what is a third-party claim? The appellee has briefed extensively under FRCP 14 a more narrow standard that says it must arise from a claim over or an action for indemnity. Although the advisory committee notes to the rule, do not say that. They actually say it's the same operative nucleus of facts and transactions. Idaho's Rule 14a takes the more liberal standard and all the cases involving it. Why Idaho rule controls here is in a removal case under the Rules Enabling Act. And anyway, if the Federal rule enlarges or takes away from the substantive right at the state court level, then the Idaho rule must be applied. And the Idaho rule does allow for this type of third-party pleading. Thank you very much. The case has arguably submitted for decision. We'll hear the next case, which is
judges: Schroeder, Goodwin, Graber